1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11

| | |
|---|---|
| GINA CHAMPION-CAIN, an individual; LUV SURF, LP, a California limited partnership; ANI COMMERCIAL CA I, LLC, a California limited liability company; and ANI COMMERCIAL CA II, LP, a California limited partnership, | CASE NO. 14-cv-2540-GPC-BLM **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** [ECF No. 18] |
| Plaintiffs, | |
| v. | |
| BRIAN MACDONALD, an individual; LOVESURF, INC., a Delaware corporation; and DOES 1-10, inclusive, | |
| Defendants. | |
| AND RELATED COUNTERCLAIM. | |

12

13

14

15

Plaintiffs,

16

v.

17

18

19

Defendants.

20

21

AND RELATED COUNTERCLAIM.

22

23

        Before the Court is Plaintiffs Gina Champion-Cain, Luv Surf, LP, ANI

24

Commercial CA I, LLC, and ANI Commercial CA II, LP's ("Plaintiffs" or "Luv Surf")

25

motion for a preliminary injunction against Defendants Brian MacDonald and

26

LoveSurf, Inc. ("Defendants" or "LoveSurf"). (ECF No. 18.) The parties have fully

27

briefed the motion. (ECF Nos. 23, 32.)

28

*///*

A hearing was held on June 18, 2015.  Following careful consideration of the parties' oral arguments and legal briefing, as well as the applicable law, and for the reasons set forth below, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.

## PROCEDURAL HISTORY

On October 23, 2014, Plaintiffs filed this action alleging claims of: (1) trademark infringement (Lanham Act, 15 U.S.C. § 1125(a)); (2) slander; (3) defamation; and (4) interference with a business advantage.  (ECF No. 1.)  On December 5, 2014, Defendants answered and filed counterclaims for: (1) trademark infringement (Lanham Act, 15 U.S.C. § 1125(a)); and (2) misappropriation of trade secrets (Uniform Trade Secrets Act, Cal. Civ. Code § 3426).  (ECF No. 9.)

On January 23, 2015, Plaintiffs filed the instant motion for a preliminary injunction, seeking to enjoin Defendants from making defamatory and disparaging statements, and from using the allegedly infringing trademarks.  (ECF No. 18.) Defendants opposed on February 20, 2015.  (ECF No. 23.)  After receiving two extensions of time in order to allow their forensic expert to conduct a forensic analysis of the computer equipment from which Defendant MacDonald produced the documents attached to his declaration in opposition to the preliminary injunction motion (ECF No. 23-1), Plaintiffs filed a reply on April 20, 2015 (ECF No. 32).  In conjunction with their reply brief, Plaintiffs filed the Declaration of Peter Garza ("Garza Declaration"), wherein their forensic expert Peter Garza ("Garza") described the analysis that lead him to conclude that Defendant MacDonald manufactured the evidence he used to support his claim of first use of the mark.  (ECF No. 32-2.)  On May 8, 2015, Defendants filed objections to the Garza Declaration (ECF No. 33) as well as a motion for sanctions before the magistrate judge (ECF No. 46).

Plaintiffs subsequently filed three *ex parte* applications relating to the pending preliminary injunction motion.  On May 22, 2015, Plaintiffs filed an *Ex Parte* Application for Leave to Submit New Evidence in Support of Motion for Preliminary

1    Injunction. (ECF No. 37.) Defendants filed a response on June 2, 2015. (ECF No. 42.)
2    On May 27, 2015, Plaintiffs filed an *Ex Parte* Motion for Order Permitting Oral
3    Argument and Limited Witness Testimony on Plaintiffs' Motion for Preliminary
4    Injunction. (ECF No. 38.) Defendants filed a response on June 3, 2015. (ECF No.
5    43.) Finally, on June 2, 2015, Plaintiffs filed an *Ex Parte* Application for Leave to
6    Submit Additional Evidence in Support of Motion for Preliminary Injunction. (ECF
7    No. 41.) Defendants filed their opposition on June 3, 2015. (ECF No. 45.) On June
8    11, 2015, Plaintiffs filed a reply. (ECF No. 48.)

9                          **FACTUAL BACKGROUND**

10        As will be discussed below, the parties vehemently dispute which company first
11   used the trademark at issue. Without making any finding at this stage as to the truth
12   of the allegations, the Court details the parties' claimed first uses below.

13   **A.    Plaintiffs' Claimed Use of their Mark**

14        Plaintiffs allege that they began using the brand "LUV SURF" in connection
15   with a vacation rental business in San Diego in August 2011, and had a logo designed
16   for "LUV San Diego SURF." (Champion-Cain Decl., ECF No. 18-2 ¶ 2; Ex. I, ECF
17   No. 19-11 at 22[1].) In October 2011, Plaintiffs received a vacation rental Transient
18   Occupancy Registration Certificate for a business named "LUV SAN DIEGO SURF."
19   (Champion-Cain Decl., ECF No. 18-2 ¶ 2; Ex. K, ECF No. 19-11 at 27). In December
20   2011, Plaintiffs ordered tote bags with their logo, and indicated on Facebook that
21   guests would receive a tote bag. (Champion-Cain Decl., ECF No. 18-2 ¶ 4; Ex. O, ECF
22   No. 19-11 at 37-38.)[2]

23        In February 2012, Plaintiffs ordered other merchandise (clothing, hats, towels)
24   with their logo. (Champion-Cain Decl., ECF No. 18-2 ¶ 4; Exhs. N, P, ECF No. 19-11

25

26   ───────────────
27   [1] Unless otherwise indicated, the Court cites to the page numbers imprinted on the top of each
     page by the Court's CM/ECF system and not the parties' page numbering at the bottom of the page.

28   [2] There is a picture of the tote bag with the logo at Ex. O, ECF No. 19-11 at 38.

at 34-35, 40.) Also in February 2012, Plaintiffs filed an application for a seller's permit to sell clothing online and in a retail store, which they received in March 2012. (Champion-Cain Decl., ECF No. 18-2 ¶ 7; Exhs. L-M, ECF No. 19-11 at 29-30, 32.)

On April 12, 2012, Plaintiffs' online store became available. (Champion-Cain Decl., ECF No. 18-2 ¶ 8.) On July 4, 2012, Plaintiffs opened their retail store. (*Id.*)

Plaintiff Gina Champion-Cain has multiple federal trademark registrations and applications. (*Id.* ¶ 9.)

- On August 27, 2013 (corrected December 9, 2014), she registered the "LUV San Diego SURF" mark for beachwear, hooded sweatshirts, t-shirts, and tank tops (Registration No. 4,390,537).[3] (Champion-Cain Decl., ECF No. 18-2 ¶ 9; Ex. A, ECF No. 19-11 at 2.) The registration states: "First Use: 2-9-2012; In Commerce 2-9-2012.") (Ex. A, ECF No. 19-11 at 2.)

- On August 5, 2014 (corrected December 9, 2014), she registered the "HEART SURF" mark for bathing suits and hats (Registration No. 4,578,750).[4] (Champion-Cain Decl., ECF No. 18-2 ¶ 9; Ex. A, ECF No. 19-11 at 3.) The registration states: "First Use 7-4-2012; In Commerce 7-4-2012." (Ex. A, ECF No. 19-11 at 3.)

- On October 21, 2014, she applied to register the "LUV San Diego SURF" mark for various goods and services, including clothing, pet accessories, surfboard accessories, and rental of vacation homes (Application Serial No. 86430225). (Champion-Cain Decl., ECF No. 18-2 ¶ 9; Ex. R, ECF No. 18-12 at 2-4.)

- On October 21, 2014, she applied to register the "HEART SURF" mark for various goods and services. (Application Serial Nos. 86430191 and 86430195)

---

[3] A picture and description of the mark is found at Ex. A, ECF No. 19-11 at 2. It consists of the stylized words "LUV San Diego SURF" in a blue cloud overlapping a beige surfboard and a white bone.

[4] A picture and description of the mark is found at Ex. A, ECF No. 19-11 at 3. It consists of the blue stylized word "surf" overlapping a pink heart. (*Id.*)

1   (Champion-Cain Decl., ECF No. 18-2 ¶ 9; Ex. R, ECF No. 18-12 at 5-8.)

2   • On October 21, 2014, she applied to register the terms "LUV SURF" for various

3   goods and services. (Application Serial No. 86430220.) (Champion-Cain Decl.,

4   ECF No. 18-2 ¶ 9; Ex. R, ECF No. 18-12 at 9-10.)

5   Plaintiffs currently manufacture and sell various products (clothing, hats, towels,

6   pet accessories with the "LUV SURF" and "HEART SURF" logos. (Champion-Cain

7   Decl., ECF No. 18-2 ¶¶ 3-4.) They market the apparel and accessories to individuals

8   with a surfer-type style, and attend and sell their merchandise at surfing competitions

9   and similar events throughout Southern California. (*Id.* ¶ 3.)

10   Plaintiffs argue they have "made a significant financial investment to develop

11   the LUV SURF Brand with its marketing materials, a website, an online presence, a

12   retail store, and in placing the LUV SURF products in local stores." (*Id.* ¶ 15.)

13   Plaintiffs declare that industry sales representatives are confused between the two

14   companies, and that a surfing magazine would not run an article from Luv Surf because

15   of the possible confusion for readers with LoveSurf.[5]  (Kramer Decl., ECF No. 18-3

16   ¶¶ 9, 11; Villatyua Decl., ECF No. 18-4 ¶ 5; Diefenbach Decl., ECF No. 18-5 ¶¶ 3-5;

17   Ex. AA, ECF No. 18-12 at 69-70.)

18   **B.   Defendants' Claimed Use of their Mark**

19   Defendants allege that they started making hats and t-shirts labeled with a tag

20   displaying "LOVESURF" in 2010. (MacDonald Decl., ECF No. 23-1 ¶ 2.) Also in

21   2010, Defendants sponsored several beach clean-ups, and passed out its hats and t-

22   shirts at those events. (*Id.* ¶ 3; Ex. 20, Dkt No. 23-21 at 2.[6])

23

24   ───────────────

25   [5] Plaintiffs also declare that Defendant McDonald's own teenage daughter expressed confusion about the two companies at a surf competition, but McDonald declares that his daughter is only four years old and did not attend the competition. (Long Decl., ECF No. 18-7 ¶¶ 2-3; McDonald Decl., ECF No. 23-1 ¶ 17.)

26

27   [6] Ex. 20 is a flyer for a July 5, 2010 beach clean up. (Ex. 20, Dkt No. 23-21 at 2.) It states that those who join the beach clean up will "receive a hat or tee sponsored by LoveSurf." (*Id.*) It

28   includes a photo of a hat with the phrase "I [red heart] SURF." (*Id.*)

By July 12, 2011, Defendants added other clothing lines using the "LOVESURF" brand, and by August 15, 2011, Defendants were selling clothing under the "LOVESURF" brand.[7] (MacDonald Decl., ECF No. 23-1 ¶ 4.) Defendants listed the clothing for sale on several websites, and the first sale of "LOVESURF" clothing was a t-shirt on August 23, 2011. (*Id.* ¶¶4-5; Ex. 14, ECF No. 23-15 at 2.)

In December 2011, Defendants created the "HEART WAVE" logo.[8] (MacDonald Decl., ECF No. 23-1 ¶ 6; Exhs. 10-11, ECF Nos. 23-11, 23-12.) By December 28, 2011, Defendants used the "HEART WAVE" logo above the word "LoveSurf" on tags of clothing for sale on the internet.[9] (MacDonald Decl., ECF No. 23-1 ¶ 7; Exhs. 12-13, ECF Nos. 23-13, 23-14.) The first sale of clothing displaying the "HEART WAVE" logo above the word "LoveSurf" occurred within a few weeks.[10] (MacDonald Decl., ECF No. 23-1 ¶ 8.)

On May 27, 2014, Defendants applied for a trademark registration for a mark consisting of the "HEART WAVE" logo to the left of the word "LoveSurf" (Application Serial No. 86292235). (*Id.* ¶ 9; Ex. Q, ECF No. 19-1 at 42-58.) The application states that the first use was by March 4, 2012, and the first use in commerce was by July 5, 2013. (MacDonald Decl., ECF No. 23-1 ¶ 9; Ex. Q, ECF No. 19-1 at

---

[7] Examples of the clothing and tags are at Exhs. 1-9, ECF Nos. 23-2, 23-3, 23-4, 23-5, 23-6, 23-7, 23-8, 23-9, 23-10.

[8] ECF No. 23-1 ¶ 6 contains a picture of the "HEART WAVE" logo.

[9] ECF No. 23-1 ¶ 7 contains a picture of the "HEART WAVE" logo with the word "LoveSurf" underneath.

[10] In December 2011, Defendants hired Chris Kramer to work on a project called "LuvYourBeach." (MacDonald Decl., ECF No. 23-1 ¶ 13; Exhs. 15-18, ECF Nos. 23-16, 23-17, 23-18, 23-19; Kramer Decl., ECF No. 18-3 ¶ 2.) Kramer allegedly learned of Defendants' plans to use the term "Luv" in connection with a line of products for different interests including "LuvSurf," and also worked on the design of Defendants' logos including the "HEART WAVE" logo. (MacDonald Decl., ECF No. 23-1 ¶¶ 14-15; Exhs. 10-11, ECF Nos. 23-11, 23-12.) Kramer quit working for Defendants after about one month, on January 3, 2012. (MacDonald Decl., ECF No. 23-1 ¶ 16; Ex. 19, ECF No. 23-20.) Shortly thereafter, Kramer began working for Plaintiffs in February 2012. (Champion-Cain Decl., ECF No. 18-2 ¶ 5; Kramer Decl., ECF No. 18-2 ¶ 2.) Kramer declares that while he worked with Defendants they never discussed a brand called "LoveSurf" or a line of products bearing that brand name. (Kramer Decl., ECF No. 18-2 ¶ 3.)

46.)  Defendants state that those first use dates refer to the first use of the combined configuration of the "HEART WAVE" logo together with a stylized version of the "LoveSurf" wordmark.  (MacDonald Decl., ECF No. 23-1 ¶ 9; Ex. Q, ECF No. 19-1 at 42.)

Defendants currently use another version of the same logo with a pink "HEART WAVE" logo and the word "LOVESURF" in all capitals.[11]  (MacDonald Decl., ECF No. 23-1 ¶ 9.)  Plaintiffs declare that Defendants changed the color of their logo to match Plaintiffs' "HEART SURF" logo.  (Kramer Decl., ECF No. 18-3 ¶ 12.)

**C.**    **Defendants' Alleged Defamation of Plaintiffs**

Plaintiffs contend that Defendants made slanderous and defamatory statements about Luv Surf on the internet, on social media, and in email correspondence with those working for Plaintiffs and with people in the surf apparel industry.

**1.**    **Defendants' Website**

Plaintiffs contend that Defendants' website contains numerous disparaging postings. (Champion-Cain Decl., ECF No. 18-2 ¶¶ 12-14.) First, Defendants' website has a posting which is entitled: "LUV SURF APPAREL – THE REAL STORY." (Ex. B, ECF No. 19-1 at 5.) It states that Plaintiffs' employee, Kramer, is trying to "rip-off" and impersonate Defendants' brand. (*Id.*) Second, Defendants' website has a posting entitled: "BEWARE OF COUNTERFEIT LOVESURF PRODUCTS TRADING UNDER THE NAME LUV SURF." (Ex. C, ECF No. 19-1 at 9.)   Third, Defendants' website has a posting entitled: "LUV SURF APPAREL BRAND DIRECTOR CHRIS KRAMER - RIP-OFF REPORT." (Ex. D, ECF No. 19-1 at 11.) This posting also states "Too bad the entire vision for this Luv Surf Apparel photo shoot was a blatant

---

[11]  ECF No. 23-1 ¶ 9 contains a picture of the current pink "HEART WAVE" logo with the word "LOVESURF" to the right in all capitals.

1   RIP-OFF of our 2013 video shoot . . . ." (*Id.*)[12]

2   **2.   Contact with Plaintiffs' Employees**

3   Plaintiffs contend that Defendants solicited three of Plaintiffs' employees to go

4   work for Defendants, and in the process disparaged "Luv Surf" and its employee

5   Kramer. (Villatoya Decl., ECF No. 18-4 ¶¶ 1-3; Diefenbach Decl., ECF No. 18-5 ¶¶ 1-

6   2; Corey Decl., ECF No. 18-6 ¶¶ 1-2.)  First, Plaintiffs' Design Director received an

7   email from Defendant MacDonald which stated that Plaintiffs' apparel "is a complete

8   RIP-OFF" of Defendants' brand, and asked her to come work for "the real LoveSurf."

9   (Villatoya Decl., ECF No. 18-4 ¶¶ 1-3; Ex. E, ECF No. 19 at 13.)  The email also stated

10  that Luv Surf is a "lame, juvenile, mis-spelled brand."  (Ex. E, ECF No. 19 at 13.)

11  Second, Plaintiffs' Sales Director received an invitation on LinkedIn from Defendant

12  MacDonald to "talk about becoming a Sales Manager at the real LoveSurf."

13  (Diefenbach Decl., ECF No. 18-5 ¶¶ 1-2; Ex. H, ECF No. 19-1 at 20.)   Finally,

14  Plaintiffs' Retail Manager and Merchandise Buyer received an invitation on LinkedIn

15  from Defendant MacDonald to "work for the real LoveSurf" and received a message

16  on Facebook that Plaintiffs' apparel "is a complete RIP-OFF" of Defendants' brand.

17  (Corey Decl., ECF No. 18-6 ¶¶ 1-2; Ex. G, ECF No. 19-1 at 18; Ex. AC, ECF No. 18-

18  12 at 78-79.)

19  **3.   Social Media**

20  Plaintiffs contend that Defendants identify Luv Surf in social media as

21  "#luvsurfislame" and "#staysloppyluvsurf." (Evans Decl., ECF No. 18-9 ¶ 3; Exhs. T-

22  U, ECF Nos. 18-12 at 20, 22.)

23  **4.   Contact with Third Parties**

24  Plaintiffs assert that Defendant MacDonald contacted various third parties to

25  disparage Luv Surf.

26  

27      [12]  Plaintiff Champion-Cain does not state in her declaration on what date she took these
screenshots.  The screenshots themselves are undated, though all three contain the following at the
28  bottom of the page: "©2014 LoveSurf Inc."  (Exs. B-D, ECF No. 19-1 at 5-11.)

First, Plaintiffs contend that Defendant MacDonald contacted Plaintiffs' public relations firm, Little Penguin.  He sent an email stating "I noticed that you have been publishing articles about a brand called LUV SURF.  I hate to be the bearer of bad news but you are promoting a brand that is a complete rip-off of the real LOVESURF, also out of Southern California. . . . . [I]f you want to support a good cause, work with us and do a write up on the real, true, authentic LOVESURF and take down the articles on the lame LUV SURF." (Stansbury Decl., ECF No. 18-8 ¶ 2; Ex. V, ECF No. 18-12 at 24-25.)  Defendant MacDonald followed up his email with a similar voice mail message.  (Stansbury Decl., ECF No. 18-8 ¶ 3; Ex. W, ECF No. 18-12 at 27.)

Second, Plaintiffs submit that Defendant MacDonald contacted a photographer who has done contract work for Plaintiffs.  He sent the photographer an email that her images are not original concepts, but imitations of LoveSurf campaigns.  (Evans Decl., ECF No. 18-9 ¶¶ 1-2; Ex. F, ECF No. 19-1 at 15.)  In addition, Defendant MacDonald posted several comments on the photographer's publicly viewable instagram account, stating the Luv Surf is a "Rip-Off" of LoveSurf and it should be "cancelled." (Evans Decl., ECF No. 18-9 ¶¶ 3; Ex. T, ECF No. 18-12 at 20.)

Third, Defendants sent a cease and desist letter to Nordstrom asserting that "LOVESURF recently learned that you carry a brand called 'Luv Surf' which bears a logo that infringes on LOVESURF's registered trademark." (Ex. B, ECF No. 37 at 9.) Defendants went on to write "[w]e are urging you to remove all of the infringing products from your website AND retail store floors and reply back to us when complete." (*Id.*)  Thereafter, on May 15, 2015, Nordstrom emailed a representative for Plaintiffs to inform her of the cease and desist letter and Nordstrom's decision to stop selling Plaintiffs' merchandise as a result.  (Ex. A, ECF No. 37 at 6.)

Fourth, in an email, dated May 13, 2015, Defendant Brian MacDonald asked the organizer of the "Sisters of the Sea" female surf competition not publish Luv Surf's logo or brand on "Sisters of the Sea" marketing materials because they were stolen. (Ex. A, ECF No. 41 at 6-7.)

1    Fifth and finally, by email dated May 27, 2015, Defendant Brian MacDonald
2    encouraged one of Plaintiffs' brand ambassadors not to do business with Plaintiffs
3    because Luv Surf is "a[n] embarrassing copy of LOVESURF." (Ex. B, ECF No. 41 at
4    9.)

5        **5.    Conduct at Surf Competition**

6        Plaintiffs contend that in Summer 2013, Plaintiffs were selling their
7    merchandise at a surf competition, and learned from attendees and customers that
8    Defendant MacDonald was walking around the event giving his hats to Luv Surf
9    customers for free, and sometimes placing his hats over the customers' Luv Surf hats.
10   (Kramer Decl., ECF No. 18-3 ¶ 6.)

11   **D.    Communications Between the Parties**

12       On July 1, 2014, Plaintiffs sent Defendants a cease and desist letter regarding
13   alleged trademark infringement and disparaging statements. (Ex. X, ECF No. 18-12
14   at 29-30.) On July 24, 2014, Defendants responded that they were not infringing, and
15   they would remove the website posts if Plaintiffs discontinued their claims of
16   infringement. (Ex. Y, ECF No. 18-12 at 48-49.) The parties exchanged other
17   correspondence. (Ex. Z, ECF No. 18-12 at 53-67.)

18                      **LEGAL STANDARD**

19       To obtain a preliminary injunction, the moving party must show: (1) a likelihood
20   of success on the merits; (2) a likelihood of irreparable harm to the moving party in the
21   absence of preliminary relief; (3) that the balance of equities tips in the moving party's
22   favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def.*
23   *Council, Inc.*, 555 U.S. 7, 20 (2008).

24       Under the Ninth Circuit's "sliding scale" approach, the first and third elements
25   are to be balanced such that "serious questions" going to the merits and a balance of
26   hardships that "tips sharply" in favor of the movant are sufficient for relief so long as
27   the other two elements are also met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d
28   1127, 1134-35 (9th Cir. 2011). A preliminary injunction is "an extraordinary remedy

1  that may only be awarded upon a clear showing that the plaintiff is entitled to such

2  relief." *Winter*, 555 U.S. at 22.  The moving party bears the burden of meeting all four

3  *Winter* prongs.  *See Cottrell*, 632 F.3d at 1135; *DISH Network Corp. v. FCC*, 653 F.3d

4  771, 776 (9th Cir. 2011).

5  **DISCUSSION**

6  **A.**     **Trademark Infringement**

7       **1.**     **Likelihood of Success on the Merits**

8       Plaintiffs argue that they will succeed on the merits of their claim for federal

9  trademark infringement, and Defendants oppose.  (ECF No.18-1 at 15-20; ECF No. 23

10  at 16-21.)

11       The Lanham Act provides "national protection of trademarks in order to secure

12  to the owner of the mark the goodwill of his business and to protect the ability of

13  consumers to distinguish among competing producers."[13]  *Park 'N Fly, Inc. v. Dollar*

14  *Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).  To prevail on a claim of trademark

15  infringement, a plaintiff must show: "(1) that it has a protectible ownership interest in

16  the mark; and (2) that the defendant's use of the mark is likely to cause consumer

17  confusion." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir.

18  2012) (citation and internal quotation marks omitted).

19       The parties primarily dispute whether Plaintiffs have a protectible ownership

20

21      [13]  Under the Lanham Act, a "trademark" includes:

22
    any word, name, symbol, or device, or any combination thereof –

23
        (1) used by a person, or

24
        (2) which a person has a bona fide intention to use in commerce and

25          applies to register on the principal register established by this chapter,

26      to identify and distinguish his or her goods, including a unique product, from those
manufactured or sold by others and to indicate the source of the goods, even if that

27  source is unknown.

28  15 U.S.C. § 1127.

interest in the mark based on priority of use.  (ECF No. 18-1 at 16-17; ECF No. 23 at 18-21.)  "'It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.'" *Rearden LLC*, 683 F.3d at 1203 (*quoting Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)).  Therefore, a party must show that it was the first to use the mark in commerce. *Id.*

Under the Lanham Act, the term "'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.  Further,

> a mark shall be deemed to be in use in commerce –
>
> (1) on goods when –
>
> > (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
> >
> > (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

*Id.*  "For both goods and services, the 'use in commerce' requirement includes (1) an element of actual use, and (2) an element of display." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001).

The Ninth Circuit has explained that:

> In determining whether the two prongs of the "use in commerce" test have been satisfied, we have . . . generally followed a "totality of the circumstances" approach.  This approach turns on "'evidence showing, first, adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind.'" . . . We have . . . indicated that evidence of actual sales, or lack thereof, is not dispositive in determining whether a party has established

"use in commerce" within the meaning of the Lanham Act. Instead, we have acknowledged the potential relevance of non-sales activity in demonstrating not only whether a mark has been adequately displayed in public, but also whether a service identified by the mark has been "rendered in commerce," 15 U.S.C. § 1127.

*Rearden LLC*, 683 F.3d at 1205 (internal citations omitted).

The Ninth Circuit has further explained that:

In applying [the "totality of the circumstances"] approach, the district courts should be guided in their consideration of non-sales activities by factors we have discussed, such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce."

*Id.* (quoting *Chance*, 242 F.3d at 1159).

Here, Plaintiffs have provided evidence that they first used the "LUV San Diego SURF" name in connection with their vacation rental business in August 2011, indicated on Facebook that guests would receive a tote bag with the "LUV San Diego SURF" logo in December 2011, and ordered other merchandise (clothing, hats, towels) with the "LUV San Diego SURF" logo in February 2012. (Champion-Cain Decl., ECF No. 18-2 ¶ 4; Exhs. I, N-O, ECF No. 19-11 at 22, 34-35, 37-38, 40.) Plaintiffs have also provided evidence that their online store became available in April 2012, and that their retail store opened in July 2012. (Champion-Cain Decl., ECF No. 18-2 ¶ 8.) Plaintiffs' registration for the "HEART SURF" logo states that it was first used in commerce in July 2012. (Ex. A, ECF No. 19-11 at 3.)

Plaintiffs contend that Defendants did not first use their mark until March 2012, or in commerce until July 2013, based on information in Defendants' trademark application. (ECF No. 18-1 at 16-17; Ex. Q, ECF No. 19-1 at 42-58.) However, Defendants have provided evidence that the first use dates in their trademark application refer to the first use of the combined configuration of the "HEART WAVE" logo together with a stylized version of the "LoveSurf" wordmark, not their use of the

"LOVESURF" wordmark or the "HEART WAVE" logo by themselves. (MacDonald Decl., ECF No. 23-1 ¶ 9; Ex. Q, ECF No. 19-1 at 42.)

Rather, Defendants have provided evidence that in 2010 they began using the wordmark "LOVESURF" on tags for hats and t-shirts. (MacDonald Decl., ECF No. 23-1 ¶¶ 2-3; Ex. 20, Dkt No. 23-21 at 2.) By August 15, 2011, Defendants were selling clothing under the "LOVESURF" brand online, and their first sale was on August 23, 2011. (MacDonald Decl., ECF No. 23-1 ¶¶ 4-5; Ex. 14, ECF No. 23-15 at 2.)    By December 28, 2011, Defendants used the "HEART WAVE" logo above the word "LoveSurf" on tags of clothing for sale on the internet, and the first sale of such clothing occurred within a few weeks. (MacDonald Decl., ECF No. 23-1 ¶¶ 7-8; Exhs. 12-13, ECF Nos. 23-13, 23-14.)

On first blush, it appears that Defendants actually were the first to use the mark in commerce. However, according to Plaintiffs' computer forensics expert (Garza), Defendant MacDonald manufactured the evidence he filed in conjunction with his declaration to show first use. (*See* Garza Decl., ECF No. 32-2.)   Defendants vehemently object to the filing of Garza's declaration and also disagree with Garza's findings and have filed objections to Garza's declaration (ECF No. 33) as well as a motion for sanctions (ECF No. 46).

While the Court takes allegations of perjury very seriously, because the Court finds that Plaintiffs have failed to satisfy the other three prongs of the *Winter* test, the Court declines at this time to address the credibility issues necessary to resolve the question of which party made first use of the mark. Further discovery is needed in this case before a determination can be made as to who is the owner of the mark.

### 2.    Irreparable Harm

In their motion, Plaintiffs argue that they will suffer irreparable harm if the requested injunction is not granted because of damage to Plaintiffs' goodwill and reputation. (ECF No. 18-1 at 20-21.) Defendants oppose, contending that Plaintiffs have not shown an immediate threat of irreparable harm because Plaintiffs have not

provided any evidence of actual threatened harm and because Plaintiffs delayed before moving for an injunction.  (ECF No. 23 at 12-16.)  In subsequently filed *ex parte* applications, Plaintiff presented evidence that (1) Defendants sent a cease and desist letter to Nordstrom, which resulted in Nordstrom discontinuing sales of Plaintiffs' t-shirts, (2) Defendant MacDonald emailed the organizer of the "Sisters of the Sea" female surf competition asking that she not publish Luv Surf's logo or brand on "Sisters of the Sea" marketing materials because they were stolen, and (3) Defendant MacDonald emailed one of Plaintiffs' brand ambassadors and encouraged her not to do business with Plaintiffs because Luv Surf is "a[n] embarrassing copy of LOVESURF."  (ECF No. 37, Ex. A; ECF No. 41, Exs. A & B.)  Plaintiffs argue that these actions demonstrate immediate harm and that Defendant MacDonald continues to damage Plaintiffs' credibility and goodwill in the community in which its products are sold.  (ECF No. 41 at 3.)  The evidence relating to Nordstrom also purportedly shows that Plaintiff has lost revenue and goodwill and will lose future profits.  (ECF No. 37 at 3.)

A plaintiff must demonstrate that irreparable injury is likely in the absence of an injunction.  *Winte*r, 555 U.S. at 20. A party seeking injunctive relief for trademark infringement must provide "evidence sufficient to establish likelihood of irreparable harm." *Herb Reed Enters., LLC v. Fla. Ent't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013); *see also Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, No. 12-cv-572-JVS, 2014 WL 1246497, at *2 (C.D. Cal. Mar. 21, 2014) (trademark infringement, itself, does not constitute irreparable harm and the existence of intangible harms such as loss of goodwill must be shown by evidence).  However, "monetary injury is not normally considered irreparable." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  As the Supreme Court has made clear:

> (T)he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury ... The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time

1
2

> and energy necessarily expended ... are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

3 *Id.* (*quoting Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotations omitted)).

4 Conclusory or speculative allegations also are not enough. *Herb Reed*, 736 F.3d at

5 1250; *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th

6 Cir.1988) ("[s]peculative injury does not constitute irreparable injury sufficient to

7 warrant granting a preliminary injunction"); *Am. Passage Media Corp. v. Cass*

8 *Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir.1985) (finding irreparable harm not

9 established by statements that "are conclusory and without sufficient support in facts").

10 Although preliminary relief may be ordered to prevent harm to a plaintiff's reputation

11 and goodwill, a finding of reputational harm may not be based on "pronouncements

12 [that] are grounded in platitudes rather than evidence." *Herb Reed*, 736 F.3d at 1250.

13     A plaintiff also must show that the harm not only is irreparable, but that

14 immediate injury is threatened. *Carribean Marine Servs.*, 844 F.2d at 674. A "long

15 delay before seeking a preliminary injunction implies a lack of urgency and irreparable

16 harm." *Oakland Tribune, Inc. v. Chronicle Pub.* Co., 762 F.2d 1374, 1377 (9th Cir.

17 1985); *see also Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1132-33 (S.D.

18 Cal. 2014) (finding delay of seven months before initiating litigation, and even longer

19 before filing preliminary injunction motion, to be inexcusable); *Edge Games, Inc. v.*

20 *Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1117-18 (N.D. Cal. 2010) (finding, where the

21 plaintiff waiting twenty-one months before seeking preliminary injunction, that "[t]he

22 undisputed fact that plaintiff did not timely act to prevent the 'Mirror's Edge' franchise

23 from inundating the market is alone sufficient to deny the instant motion").

24     Here, Plaintiffs' delay in seeking injunctive relief undermines its claim that it

25 will be irreparably harmed.  Plaintiffs state that they knew that Defendants were

26 marketing "LoveSurf" products around July 2013, and Plaintiffs sent Defendants a

27 cease and desist letter on July 1, 2014. (Kramer Decl., ECF No. 18-3 ¶¶ 4, 6; Ex. X,

28 ECF No. 18-12 at 29-30.)  However, Plaintiffs did not file this case until October 23,

1   2014 (15 months after learning that Defendants were marketing "LoveSurf" products),

2   and did not file the instant motion for a preliminary injunction until January 23, 2015

3   (18 months after learning of the "Lovesurf" marketing).[14]  (ECF No. 18.)  These actions

4   do not imply a sense of urgency.

5        In addition, Plaintiffs have provided insufficient evidence that they will suffer

6   *irreparable* harm.  Plaintiffs contend that they will suffer irreparable harm because they

7   spent money to develop their brand, Defendants knowingly copied their mark, the

8   parties' products directly compete, Plaintiffs have no ability to control quality, the

9   products are sold through the same channels, and individuals in the surf industry have

10   indicated that they associate Defendants' LoveSurf products with Plaintiffs' LUV

11   SURF mark.  (ECF No. 18-1 at 20-21.)  Additionally, Plaintiffs point to the loss of

12   income from Nordstrom and the damage to their goodwill caused by Defendant

13   MacDonald's ongoing contacts with Plaintiffs' vendors and brand ambassadors.  (ECF

14   No. 37 at 3; ECF No. 41 at 3.)  While all of these factors certainly show some degree

15   of harm to Plaintiffs, Plaintiffs have not demonstrated harm that cannot be compensated

16   through monetary damages or other corrective relief on a later date.  *Los Angeles*

17   *Mem'l Coliseum Comm'n*, 634 F.2d at 1202 (concluding plaintiff failed to show

18   irreparable harm where alleged injuries of diminution of revenues and market value of

19   property, loss of goodwill normally attached to a profitable enterprise, and inability to

20

21       [14] In their recently-filed reply regarding one of their *ex parte* applications, Plaintiffs argue that any delay should not be held against them because (1) "any delay is excusable where the Plaintiff acts

22   as soon as the Defendant has a measurable impact on Plaintiffs' goodwill and business reputation," and (2) Plaintiffs were attempting to resolve their dispute with Defendants without court intervention.

23   (ECF No. 48 at 2-3.)  Plaintiffs quote a portion of *E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983) in support of their argument, but the whole quote says "[h]ad defendant's encroachment

24   been minimal, or its growth slow and steady, there would be no laches.*"*  The Court finds that regardless of how slow Defendants' growth may have been, LoveSurf's encroachment was far from

25   minimal.  From the beginning, both companies have been selling t-shirts and other clothing emblazoned with the words "LoveSurf" or "Luv Surf" in the same market, which means Defendants'

26   encroachment was significant from the onset.  Moreover, Plaintiffs argue that they "became aware that Defendants broadened the scope of its infringing conduct" in June of 2014 and that they opened

27   discussions with Defendants soon thereafter to try to resolve the dispute.  (ECF No. 48 at 3.)  This still does not explain the three-month delay between filing the instant lawsuit and filing their preliminary

28   injunction motion.  Therefore, Plaintiffs' new arguments do not alter this Court's determination.

enter lease agreement and begin stadium renovations all could be remedied by a damage award).  Moreover, though "[e]vidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm," *Herb Reed*, 736 F.3d at 1250, the fact that Plaintiffs have been competing in the same market with Defendants for at least two years and have presented only one piece of evidence of damage to their goodwill[15] counsels against such a finding.  If Plaintiffs' evidence suggested that, absent an injunction, Defendants' actions were likely to put Plaintiffs out of business, the Court's decision might be different.  *See Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1203 (finding insufficient showing of irreparable harm where monetary remedy would suffice and "the Commission [did not] contend or show that loss of the Raiders as a tenant threatened to put it or the Coliseum out of business"); *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 994 (N.D. Cal. 2013) (finding irreparable harm where injunction would effectively destroy business and plaintiff satisfied requirement of providing adequate evidence of the threat that was causally connected to the alleged wrongdoing), *aff'd sub nom. Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967 (9th Cir. 2013) *and aff'd sub nom. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014).  It does not.  To the contrary, Plaintiff's counsel acknowledged during the hearing that Plaintiffs are still able to operate their business.  Thus, Plaintiffs have not made a showing of *irreparable* harm.

On a final note, Plaintiffs cited during the hearing before this Court to *Stuhlbarg Int'l Sales Co., Inc. v. Brush and Co., Inc.*, 140 F.3d 832 (9th Cir. 2001) for the proposition that the denial of expansion of one's business constitutes irreparable harm. Plaintiffs' contend that they had been working hard to expand their business and that Defendant MacDonald's interference with Nordstrom and other potential customers has

---

[15]  Though, Nordstrom's decision to stop carrying the Luv Surf line may be less evidence of lost goodwill as it is evidence that Nordstrom does not wish to be caught in the middle of a trademark dispute.  Having made the decision following receipt of Defendants' cease and desist letter, Nordstrom may well agree to resume carrying Plaintiffs' products if Plaintiffs are successful in this case and present Nordstrom with a court order confirming their right to the mark.

1  inhibited their ability to expand the business.  Defendants responded that the standard

2  for preliminary injunctions has become more stringent since *Stuhlbarg*, as explained

3  by the Supreme Court in *Winter*, so *Stuhlbarg* is of limited value.

4       As an initial matter, Defendants are correct that in *Stuhlbarg*, the standard for a

5  preliminary injunction required the moving party to "show ***either*** (1) a combination of

6  probable success on the merits and the possibility of irreparable injury, ***or*** (2) that

7  serious questions are raised and the balance of hardships tips sharply in favor of the

8  moving party."  *Stuhlbarg*, 140 F.3d at 839-40 (emphasis added).  After *Winter*, the

9  Ninth Circuit's sliding scale approach may still be employed, but the moving party

10  must make a sufficient showing as to ***all four*** prongs of the test.  *Winter*, 555 U.S. at

11  20; *Cottrell*, 632 F.3d at 1135 ("[t]o the extent prior cases applying the 'serious

12  questions' test have held that a preliminary injunction may issue where the plaintiff

13  shows only that serious questions going to the merits were raised and the balance of

14  hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs,

15  they are superseded by *Winter,* which requires the plaintiff to make a showing on all

16  four prongs").  In *Stuhlbarg*, the court found a likelihood of success on the merits and

17  the possibility of irreparable harm and ended the inquiry there.  More is required in this

18  case.

19       Additionally, the facts of *Stuhlbarg* are distinguishable.  In *Stuhlbarg*, Sisco[16]

20  and Brush were both in the business of selling home safes marketed as "firesafe,"

21  though Brush actually had trademarks for the term "Fire-Safe."  *Stuhlbarg*, 140 F.3d

22  at 834-35.  Sisco had used the term "firesafe" with Brush's knowledge for at least

23  fourteen years, but Brush did not immediately take action to enforce its marks.  *Id.* at

24  835.  However, when Sisco began targeting Brush's customers, Brush recorded its

25  "Fire-Safe" trademark with the U.S. Customs Service, which resulted in Customs

26  detaining over 6,000 Sisco safes, which were destined for one of Sisco's new

27

28       [16] Stuhlbarg International Sales Company was known as "Sisco."

customers.  *Id.*  Sisco responded by filing suit for a declaratory judgment of non-infringement and cancellation of Brush's trademarks, and sought a preliminary injunction to prevent Brush for interfering with the importation of Sisco's safes.  *Id.* at 835-36.  The district court granted the injunction finding that "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Id.* at 841.  Concluding that this finding was not clearly erroneous, the appellate court affirmed.

However, the district court also explained that the "appropriate status quo" was permitting Sisco to continue to import safes and use the term "firesafe" as it had for over a decade.  *Id.*  In the instant case, as in *Stuhlbarg*, Plaintiffs were aware of Defendants' use of the marks long before they took action.  Plaintiffs acknowledge knowing of Defendants' use as early as July 2013, but they did not file this action until over a year later when Defendants began having an impact on their business.  However, unlike in *Stuhlbarg,* Plaintiffs are trying to enjoin Defendants from selling their products instead of the other way around.  Thus, under the reasoning of *Stuhlbarg*, the "appropriate status quo" would not be to enjoin Defendants, but rather to allow Defendants to continue to use "LoveSurf" as they have been, with Plaintiffs' knowledge, for several years.  Furthermore, while the Ninth Circuit found that it was not clearly erroneous for the district court to find that loss of prospective customers supports a finding of irreparable harm, the Court does not construe the holding as *requiring* a finding of irreparable harm upon any showing of loss of prospective customers.  The Court, therefore, finds that *Stulhbarg* does not bolster Plaintiffs' claim.

For the foregoing reasons, the Court finds that Plaintiffs failed to demonstrate a likelihood of irreparable harm.  Though the Court need not address the remaining prongs of the preliminary injunction test where the moving party fails to establish likelihood of irreparable harm, *see Cottrell*, 632 F.3d at 1135 (requiring the moving party to satisfy all four prongs of *Winter* test), the Court will consider the final two factors in light of the uncertainty surrounding the first prong of the test.

### 3.     Balancing of Equities

Plaintiffs contend that the balance of equities tips in its favor because Defendants brought any injury upon themselves by knowingly adopting the LoveSurf mark with the intent to deceive. (ECF No. 18-1 at 21.)  Defendants counter that if an injunction issues, they will face considerable monetary and reputational costs.  (ECF No. 22.)

The Court concludes that the balance of the equities weighs in favor of Defendants.  Defendants would be forced to rebrand all of their merchandise, change the name of their company, and stop selling all of the items emblazoned with the term "LoveSurf."   While Plaintiffs have lost one customer and some goodwill due to Defendant MacDonald's actions, the impact on Plaintiffs in denying their motion would be far less severe.  Moreover, the purpose of a preliminary injunction is to maintain the status quo pending a determination on the merits, *see Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1200, and denying, not granting, the injunction motion is more likely to maintain the status quo that has existed during the two years since Plaintiffs first learned of Defendants' allegedly infringing conduct.

### 4.     Public Interest

Plaintiffs do not specifically argue why an injunction would be in the public interest.  (*See* ECF No. 18-1 at 22.)  Defendants point out that in trademark cases, courts often define the public interest as the public's right not to be confused or deceived. (ECF No. 23 at 22 (*citiing Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008), *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001), and *BellSouth Adver. & Publ'g Crop. v. The Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991)).

While Defendant is correct and issuance of an injunction would put an end to the confusing marketing and sale of two nearly identical brands, the uncertainty over who is the senior user of the mark makes it impossible for the Court to make a determination as to how best to prevent deception or confusion of the public.  As a result, the outcome on this prong is a draw.

### 5.     Conclusion Regarding Trademark Infringement

The Court concludes that Plaintiffs have not made a clear showing that they are entitled to the extraordinary remedy of a preliminary injunction on their trademark infringement claim, *Winter*, 555 U.S. at 22, and therefore **DENIES** Plaintiffs' motion.

## B.     Defamation

Plaintiffs seek to enjoin Defendants from making defamatory statements about the Luv Surf brand on LoveSurf's website, in solicitations to Luv Surf employees, and on social media. (ECF No. 18-1 at 13.)  Defendants argue that the Court cannot grant Plaintiffs' request to enjoin Defendants' future speech because such an action would constitute a prior restraint on speech, which is unconstitutional. (ECF No. 23 at 16-20.) Plaintiffs counter that Defendants' statements are commercial speech and may be enjoined.  (ECF No. 32 at 9-10.)

As with Plaintiffs' trademark infringement claim, in order to justify a preliminarily injunction, Plaintiffs would have to satisfy the four-prong *Winter* test. The first question then is whether Plaintiffs can show likelihood of success on the merits.  "Defamation is an invasion of the interest in reputation . . . which involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999), *as modified* (June 23, 1999) (*citing* Cal. Civ. Code, §§ 45, 46, 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 471, pp. 557-558)). "In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose." *Id.* at 646.  Because the Court cannot discern at this juncture which party owns the mark, the Court also cannot determine whether Defendants' statements are true or false.   Plaintiffs suggest that Defendant MacDonald's statements constitute commercial speech—that is, speech proposing a commercial transaction—which is afforded a more limited measure of First Amendment protection.  (ECF No. 32 at 9.)  However, even commercial speech may

be suppressed if the "communication[s] [are] more likely to deceive the public than to inform it." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980).  Again, without knowing whether Defendants' statements are true or deceptive, the Court cannot determine whether Defendants' speech may be enjoined.

In regard to irreparable harm, Plaintiffs argue, without elaboration, that Defendants' statements have damaged its business and are adversely affecting sales. (ECF No. 18-1 at 15.)  While Defendants' aggressive behavior towards Plaintiffs as well as their vendors, customers, and employees has caused Plaintiffs some economic and reputational harm (and seems unwise while litigation is ongoing), the Court finds the analysis for this element the same as detailed above in regard to Plaintiffs' trademark infringement claim.  Accordingly, the Court finds that Plaintiffs have not demonstrate that irreparable harm is likely and finds that Plaintiffs' alleged damages can be addressed through monetary and/or other corrective relief on a later date.  *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202.

Plaintiffs' memorandum addresses the balance of hardships and public interest prongs of the *Winter* test jointly as to their trademark infringement and defamation causes of action.  (ECF No. 18-1 at 21-22.)  Thus, the arguments are the same as those set forth in the preceding section of this order. Given the overlap in the claims and that the alleged hardships and public interest are the same, the Court's previous determination on these issues applies equally to Plaintiffs' defamation claim.

The Court, therefore, finds that Plaintiffs have failed to satisfy all four prongs of the *Winter* test and **DENIES** Plaintiffs' motion for a preliminary injunction in regard to its defamation claim.

///

///

///

///

**CONCLUSION AND ORDER**

For the foregoing reasons, the Court finds that Plaintiffs have not made a clear showing that they are entitled to the extraordinary remedy of a preliminary injunction. *Winter*, 555 U.S. at 22.  The Court, therefore, **DENIES** Plaintiffs' motion for a preliminary injunction (ECF No. 18).

**IT IS SO ORDERED.**

DATED:  July 15, 2015

HON. GONZALO P. CURIEL
United States District Judge